UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

BRANDS WITHIN REACH, LLC,

                            Plaintiff,

     -against-

BELVOIR FRUIT FARMS LTD.,

                            Defendant.

------------------------------------------------------------------X

**DECISION AND ORDER**

19-cv-4947 (AEK)

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**[1]

    Plaintiff Brands Within Reach, LLC ("BWR") brings this action against Defendant Belvoir Fruit Farms Ltd. ("BFF"), asserting claims for breach of contract under N.Y. U.C.C. § 2-101, *et seq.*, breach of the implied covenant of good faith and fair dealing, and declaratory judgment pursuant to 28 U.S.C. § 2201.  ECF No. 1 ("Complaint" or "Compl.").  Currently before the Court are BFF's motion for summary judgment (ECF No. 84) and BWR's cross-motion for summary judgment (ECF No. 92).  For the reasons that follow, BFF's motion is GRANTED IN PART AND DENIED IN PART, and BWR's cross-motion is GRANTED IN PART AND DENIED IN PART.

## I.    BACKGROUND

    The following facts—taken from BFF's Local Civil Rule 56.1 Statement ("BFF's 56.1"), ECF No. 86, BWR's Local Civil Rule 56.1 Response ("BWR's Response") and

---

[1] The parties consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) on June 7, 2021.  ECF No. 79.

Counterstatement ("BWR's 56.1"), ECF No. 92-2,[2] BFF's Response to BWR's

Counterstatement ("BFF's Response"), ECF No. 100, and the evidence submitted by the parties

in connection with the motion—are undisputed unless otherwise noted.

BFF is an entity engaged in the manufacture of certain beverages in the United Kingdom.

BWR's 56.1 ¶ 4.  BWR is an entity in the food and beverage industry, offering healthy food and

beverage alternatives to consumers.  *Id.* ¶ 1.  In 2011, at the largest food trade show in New

York, Peverel Manners, who was then the majority shareholder, managing director, and Chief

Operating Officer of BFF, met Olivier Sonnois, who was then the sole member of BWR.

BWR's 56.1 ¶¶ 3, 6, 13; *see* ECF No. 92-3 ("Rainone Decl.") Ex. 3 ("Manners Depo.") at 6:23-

7:9.[3]  BFF chose to work with BWR as its distributor following that meeting.  BWR's 56.1 ¶ 15.

BWR and BFF proceeded to negotiate a distribution agreement, which involved the exchange of

several drafts.  *Id.* ¶¶ 16-18.

In mid-January 2012, BFF and BWR entered into a Distribution Agreement

("Agreement").  BFF's 56.1 ¶ 1; BWR's 56.1 ¶¶ 18, 22; ECF No. 92-4 ("Sonnois Decl.") Ex. 1.

The Agreement provides that BWR was to act as an exclusive distributor of BFF's products in

the United States and Canada.  BFF's 56.1 ¶ 2.  A section of the Agreement titled "Length and

Type of Agreement" states, "5 year licensing agreement with 3 year on-going subsequent

---

[2] "BWR's Response" refers to the first 17 paragraphs of ECF No. 92-2, which respond to BFF's Local Civil Rule 56.1 Statement; "BWR's 56.1" refers to the subsequent 112 paragraphs of ECF No. 92-2, which set forth BWR's own counterstatement of facts.

[3] BFF disputes that Sonnois was the sole member of BWR from the commencement of this action until November 2020, as set forth in BWR's 56.1, citing evidence that BWR was sold to New Age Group in July 2019 and that New Age Group then sold BWR in September 2020. *See* BFF's Response ¶ 3.  In addition, Sonnois testified at his deposition he was the "sole equity holder" of BWR until he sold the business in July 2019 to New Age Beverages.  *See* Rainone Decl. Ex. 7 ("Sonnois Depo.") at 26:18-27:9.

renewal unless terminated for Cause.  Effective January 2, 2012."  BFF's 56.1 ¶ 3; *see* BWR's

56.1 ¶¶ 30-31; Sonnois Decl. Ex. 1 at 1.  BFF maintains that the Agreement could only be

terminated "for cause" and that the Agreement contained no provision for termination without

cause.  BFF's 56.1 ¶¶ 4, 5.  BWR disputes this characterization of the Agreement, and asserts

that the "Termination" section of the Agreement refers to termination without cause, non-

renewal of the agreement, and termination for cause.  BWR's Response ¶¶ 4-5.  The Agreement

does not define the term "cause" with respect to terminations.  BFF's 56.1 ¶ 6.  The

"Termination" section of the Agreement provides as follows:

> Upon termination without cause or non[-]renewal of agreement, BWR will
> receive the highest of a net compensation allowance of US$5 per case for
> all cases sold since the beginning of the agreement or a full reimbursement
> of all Overhead, Regulatory, Marketing and Sales Promotions investments
> made since the beginning of the agreement (whichever is highest).
>
> Termination for Cause of the contract will be without penalty with 90
> days['] notice.

Sonnois Decl. Ex. 1 at 3.  The parties dispute whether this section constitutes a "penalty

provision" or a "buyout clause."  BFF's 56.1 ¶ 8; BWR's Response ¶ 8; BWR's 56.1 ¶ 36; BFF's

Response ¶ 36.

According to BFF, from the start of the Agreement and throughout its seven-year history,

BWR almost never made a payment on time.  BWR's 56.1 ¶ 47.  On January 29, 2019, BFF

received a notice from Coface, a credit insurance provider, stating that the credit export

insurance for sales to BWR was reduced to £0.  *Id.* ¶ 77.  Although Coface reinstated the credit

export insurance on BWR in the amount of £50,000 in early March 2019, and on March 8, 2019,

temporarily raised the insurance coverage to £200,000, BFF contends that this was not sufficient

in light of BFF's potential exposure on its outstanding invoices to BWR.  *Id.* ¶¶ 78-79; BFF's

Response ¶¶ 78-79.

On March 26, 2019, BFF sent BWR a demand for adequate assurances.  BWR's 56.1 ¶ 83; *see* Sonnois Decl. Ex. 4.  BFF admits that the cancellation of the Coface insurance was one of the primary reasons it sought assurance of continued performance under the Agreement.  BFF's Response ¶ 86.  BFF also admits that the Agreement does not refer to commercial credit insurance.  *Id.* ¶ 87.  BFF's demand for adequate assurances required that BWR provide such adequate assurances by April 26, 2019.  BWR's 56.1 ¶ 94.  BWR responded to the demand for adequate assurances on April 10, 2019, Sonnois Decl. Ex. 5, but the parties dispute whether BWR provided adequate assurances of continued performance, BWR's 56.1 ¶¶ 95-99, 101; BFF's Response ¶¶ 95-99, 101.

BFF wrote a letter on May 8, 2019 which, according to BWR, terminated the Agreement.  BWR's 56.1 ¶ 100; *see* Sonnois Decl. Ex. 6.  The letter stated BFF's position that BWR had not provided adequate assurances of continued performance in response to the March 26, 2019 demand, and that the letter "shall serve as notice to BWR that BWR's failure to provide adequate assurances is a repudiation" of the Agreement.  Sonnois Decl. Ex. 6.  Further, as set forth in the May 8, 2019 letter, BFF considered BWR's repudiation of the Agreement "final," and BFF asserted that that the Agreement was therefore "cancelled and without further force or effect."  BFF's Response ¶ 100; Sonnois Decl. Ex. 6.  In a letter dated May 13, 2019, BWR demanded that BFF pay $2,462,835.00 pursuant to the "Termination" section of the Agreement.  BWR's 56.1 ¶ 102; *see* Sonnois Decl. Exs. 1, 7.[4]  In a letter dated May 18, 2019, BFF responded to BWR's demand, reiterating its view that BWR had failed to provide adequate assurances, and

---

[4] In this action, BWR asserts that BFF terminated the Agreement without cause, and therefore BWR is entitled to damages in the amount of $5 per case sold over the life of the Agreement as provided in the "Termination" section.  *See* Compl. ¶¶ 30, 35-36, 46-47, 59; Sonnois Decl. Ex. 1 at 3.

noting that BWR owed BFF £320,340.74 for unpaid inventory.  BWR's 56.1 ¶ 103; *see* Sonnois

Decl. Ex. 8; BFF's 56.1 ¶ 13.

## II.    DISCUSSION

### A.    Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should

be granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 320-23 (1986).  A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine

issue of material fact exists, a court should "constru[e] the evidence in the light most favorable to

the nonmoving party and draw[] all reasonable inferences in its favor."  *Mount Vernon Fire Ins.*

*Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.*, 259

F.3d 91, 97 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir. 1998);

*see also Anderson*, 477 U.S. at 261 n.2.  Thus, "[o]nly when no reasonable trier of fact could find

in favor of the nonmoving party should summary judgment be granted."  *Cruden v. Bank of New*

*York*, 957 F.2d 961, 975 (2d Cir. 1992) (quoting *H.L. Hayden Co. v. Siemens Med. Sys. Inc.*, 879

F.2d 1005, 1011 (2d Cir. 1989)).  Where each party moves for summary judgment, "each party's

motion must be examined on its own merits, and in each case all reasonable inferences must be

drawn against the party whose motion is under consideration."  *Morales v. Quintel Entm't, Inc.*,

249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d

Cir. 1981)).

**B.      BFF's Motion Regarding BWR's Breach of Contract Claim**

BFF argues that it is entitled to summary judgment on BWR's first claim, for breach of

contract, which is premised on the allegation that BFF terminated the Agreement without cause

and is therefore liable for what BWR calls a "termination fee," *i.e.*, liquidated damages, as

provided for in the Agreement.  According to BFF, summary judgment is warranted on the

breach of contract claim because (1) the Agreement was terminable at will by either party; and

(2) the "termination fee" is an impermissible penalty.  ECF No. 85 ("BFF's Mem.") at 1.

Consequently, BFF asserts that the "question of whether [it] had sufficient 'cause' to terminate

the Agreement is a non-issue."  *Id.*  The Court addresses these arguments in turn.

**1.      Contract of Indefinite Duration and Terminable at Will**

The Agreement provides that it was for an initial term of five years "with 3 year on-going

subsequent renewal unless terminated for Cause."  Sonnois Decl. Ex. 1 at 1.  "Under New York

law, it is well settled that a contract of indefinite duration is terminable at will unless the contract

states expressly and unequivocally that the parties intend to be perpetually bound."  *Compania*

*Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co*., 976 F.3d 239, 245 (2d Cir. 2020).[5]

BFF asserts that this case is similar to *Compania Embotelladora*, which involved the

interpretation of a contract between Pepsi Cola Company ("Pepsi") and Compania

Embotelladora Del Pacifico, S.A. ("CEPSA"), a bottler in Peru.  The contract did not have a

definite term of duration, but paragraph 22 of the contract provided that Pepsi "had the right to

'cancel or terminate . . . by written notice' . . . '[u]pon the happening' of [one of] five

_____

[5] There is no dispute that New York law governs the claims and counterclaims in this
matter.  In a section titled "Jurisdiction," the Agreement states, "State of New York."  Sonnois
Decl. Ex. 1 at 3.  Moreover, the parties' pleadings expressly reference New York law.  ECF Nos.
1, 5.

enumerated events," such as CEPSA's breach of the contract, the sale or transfer of all or part of

CEPSA's business or stock without Pepsi's permission, CEPSA's failure to bottle for 30

consecutive days, or insolvency, voluntary bankruptcy, or failure to vacate an involuntary

bankruptcy.  976 F.3d at 242.  Pepsi was not required, however, to terminate the contract upon

the happening of any of these events, and CEPSA did not have any equivalent right to terminate

the contract.  *Id.*  After more than 40 years of performance, Pepsi terminated the contract and

provided five grounds for termination; CEPSA sued for, among other things, wrongful

termination of the contract.  *Id.* at 242-43.

The *Compania Embotelladora* panel held that because parties' contract did not have a

definite term and did not contain a "clear statement of perpetuity," it was therefore terminable at

will.  The conclusion that Pepsi was authorized to terminate the contract at will did not render

Pepsi's optional termination rights in paragraph 22 superfluous—provisions specifying grounds

for termination in an at-will contract "may serve a cautionary function, warning of conduct or an

occurrence that might prompt one party to terminate."[6]  *Id.* at 246 (cleaned up).  In addition, the

panel also distinguished Pepsi's optional termination provision in the *Compania Embotelladora*

contract from cases where the contracts at issue provided no fixed date for termination, but

conditioned the continued obligation upon an event that would *necessarily* terminate the

---

[6] The *Compania Embotelladora* court further explained that the paragraph 22 criteria also served, in this context, as a limitation on the "reasonable-duration requirement" in New York law for "exclusive distribution agreements that are otherwise terminable at will."  976 F.3d at 246. The parties in this matter offer various arguments about the applicability of the "reasonable duration" requirement to the Agreement, *see* ECF No. 92-1 ("BWR's Mem. in Opp'n") at 16-17 and ECF No. 97 ("BFF's Mem. in Opp'n") at 17-19, but these arguments need not be addressed here because, as explained below, the Court finds that the Agreement in this case was not terminable at will.

contract, *id.* at 246 n.9; such contracts are not understood to be indefinite contracts and are therefore not terminable at will.

Most critically for purposes of this matter, the *Compania Embotelladora* panel addressed the case of *Ketcham v. Hall Syndicate, Inc.*, 37 Misc. 2d 693 (N.Y. Sup. 1962), *aff'd without opinion*, 19 A.D.2d 611 (1st Dep't 1963), which involved a contract "in which an artist agreed to create and provide cartoons for syndication indefinitely," and which "stated expressly that it would renew automatically from year to year, except that both parties had the right to terminate if the artist's share of revenue fell below a stipulated amount." *Id.* There, the *Compania Embotelladora* court observed, "[t]he [*Ketcham*] court held that the contract was not indefinite as to its duration, even if it provided for perpetual performance, because 'specific provision [was] made for termination.'" *Id.* (quoting *Ketcham*, 37 Misc. 2d at 699). The *Compania Embotelladora* court distinguished *Ketcham* on the ground that while the termination provision in *Ketcham* was also voluntary—the contract did not mandate termination upon the occurrence of the triggering event—it was a mutual termination right equally available to both parties. *Id.* In contrast, it did not follow that the *Compania Embotelladora* contract—with its "voluntary, *unilateral* termination provision"—"is one in which 'specific provision was made for termination' because, from the perspective of one party, there is no such provision for termination and the contract is perpetual." *Id.* (emphasis in original).

BWR urges reliance on *Shoppertrak RCT Corp. v. Barnes & Noble, Inc.*, No. 20-cv-3814 (JPO), 2021 WL 517819 (S.D.N.Y. Feb. 10, 2021), which referenced *Ketcham* in finding that a contract was not of indefinite duration. The contract in *Shoppertrak*, between a retail analytics company and the largest retail bookseller in the U.S., provided for automatic renewal for one-year periods following the initial term unless either party provided written notice of non-renewal

at least 30 days before the expiration of the then-current term.  2021 WL 517819, at *1.  The district court determined that the contract was similar to the one in *Ketcham* in that "it renews automatically and gives *both* parties the optional right to terminate given the occurrence of certain events.  (Agmt. at 7 § 10.[[7]])"  *Id.* (emphasis in original).  The court therefore determined that the agreement "was not indefinite and not terminable at will."  *Id.*

Here, the Agreement is more analogous to the contracts at issue in *Shoppertrak* and *Ketcham* than to the contract at issue in *Compania Embotelladora*.  The Agreement provides for automatic renewal, but includes an optional right to terminate "for cause," which appears on the face of the Agreement to be mutual—that is, equally available to either party to exercise.  A complicating factor here is that the term "for cause" is not defined in the Agreement; neither BFF nor BWR addresses this contract ambiguity in its motion papers, and the Court cannot determine on the record presented the precise meaning of "for cause" as used in the Agreement.  But just because the term "for cause" is undefined, and thus, ambiguous, does not mean that the parties did not have mutual, optional termination rights.  It only means that there is a question as to what constitutes "cause," *i.e.*, what the parties considered to be permissible grounds for termination.

The only evidence that the Court could find regarding this issue in the parties' voluminous submissions was the deposition testimony of Olivier Sonnois of BWR, who provided several possibilities as to what might constitute "cause" that would allow BFF to terminate the Agreement, such as if BWR changed its focus or strategy; if BWR went bankrupt; BWR's failure to meet the minimum volumes; and "whatever is defined in this agreement that

---

[7] Section 10 of the parties' agreement in *Shoppertrak* set forth circumstances in which either party had the right and/or option to terminate the agreement, including an unremedied "material breach" by one party of its obligations under the agreement as well as the insolvency of a party.  *See Shoppertrak RCT Corp. v. Barnes & Noble, Inc.*, No. 20-cv-3814 (JPO) (S.D.N.Y.), ECF No. 14-1.

could not be done." Sonnois Depo. at 72:17-76:14. Sonnois also provided several possibilities as to what might constitute cause that would allow BWR to terminate the Agreement—for example, if BFF ceased distribution, changed the formulation of its product, changed its packaging, or changed its management or ownership. *Id.* at 76:15-79:15. Whatever the term "for cause" was intended to mean in the Agreement, it would stand to reason that it would include a material, unremedied breach of either party's obligations under the agreement—one of the precise events that the court in *Shoppertrak* recognized as a mutual optional termination right under that agreement. *See* 2021 WL 517819 at \*3.

BFF insists that "the 'for cause' language does not constitute a termination right of any kind," *see* BFF's Mem. in Opp'n at 16 (emphasis omitted), but this cannot be squared with the plain language of the Agreement, which allows for the possibility that the Agreement could be "terminated for Cause." Sonnois Decl. Ex. 1 at 1. Further, the fact that the Agreement contains language in the "Termination" provision distinguishing between what would happen in the event of a "termination without cause" and what would happen following a "Termination for Cause" reinforces the conclusion that there is a condition or set of conditions that would allow either party the right to terminate the Agreement—otherwise such distinction would been completely unnecessary.

Of course, this does not resolve the ambiguity of the term "for Cause," but that is not an issue that can be adjudicated on summary judgment based on the current record. Where "the language used [in a contract] is susceptible to differing interpretations, each of which may be said to be as reasonable as another, then the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent properly is admissible." *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 41 (2d Cir. 2019) (quotation marks

omitted).  While there is no defined durational term in the Agreement, the contract at issue here

is comparable to the contracts in *Ketcham* and *Shoppertrak*: it renews automatically, but gives

both parties the optional right to terminate given the occurrence of events constituting "cause,"

even though that term is undefined in the Agreement.  Accordingly, the Agreement is not

indefinite and is not terminable at will, and BFF is not entitled to summary judgment on this

basis.[8]

### 2.    Liquidated Damages

BWR alleges that BFF terminated the Agreement without cause, and therefore that BWR

is entitled to damages of $2,462,835 pursuant to the "Termination" provision of the Agreement,

representing "US$5 per case for all cases sold since the beginning of the [A]greement" ($5 x

492,567 cases sold since the beginning of the Agreement).  *See* Sonnois Decl. Ex. 1 at 3.  BFF

argues that summary judgment is appropriate as to count one of the Complaint because the

Termination provision is a penalty prohibited under New York law.

### a.    Legal Standard

"Whether a liquidated damages provision is enforceable 'is a question of law, giving due

consideration to the nature of the contract and the circumstances.'"  *Paguirigan v. Prompt*

*Nursing Emp. Agency, LLC*, 827 F. App'x 116, 119 (2d Cir. 2020) (summary order) (quoting

*JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 379 (2005)).  "'A liquidated damages

provision is an estimate, made by the parties at the time they enter into their contract, of the

extent of the injury that would be sustained as a result of a breach of the agreement.'"  *Id.*

---

[8] If the evidence at trial reveals that the optional right to terminate the Agreement "for
cause" was only unilateral—and therefore more analogous to the contract at issue in *Compania
Embotelladora*—then BFF may be able to revisit this issue as part of a motion for judgment as a
matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.

(quoting *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977))

(cleaned up).  However, "a liquidated damages clause cannot act as a penalty." *Id.*  Therefore

"'a contractual provision fixing damages in the event of breach will be sustained only if [1] the

amount liquidated bears a reasonable proportion to the probable loss and [2] the amount of actual

loss is incapable or difficult of precise estimation.'" *Id.* (quoting *Truck Rent-A-Ctr., Inc.*, 41

N.Y.2d at 425) (cleaned up).  "A clause which provides for an amount plainly disproportionate to

real damage is not intended to provide fair compensation but to secure performance by the

compulsion of the very disproportion.  A promisor would be compelled, out of fear of economic

devastation, to continue performance and his [or her] promisee, in the event of default, would

reap a windfall well above actual harm sustained." *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 424.

"In making this assessment, courts consider the facts as they existed 'at the time the

parties entered into their agreement.'" *Paguirigan*, 827 F. App'x at 119 (quoting *JMD Holding

Corp.*, 4 N.Y.3d at 380) (cleaned up).  "[I]t is the party seeking to invalidate the liquidated

damages clause that bears the burden of demonstrating that it is unenforceable." *Id.*  "New York

courts also give due consideration to whether the parties were sophisticated and represented by

counsel, the contract was negotiated at arms-length between parties of equal bargaining power,

and that the provision was freely contracted to." *AXA Inv. Managers UK Ltd. v. Endeavor Cap.

Mgmt. LLC*, 890 F. Supp. 2d 373, 388 (S.D.N.Y. 2012) (cleaned up).[9]

Although earlier cases tended to balance competing policy objectives by finding "a

presumption, in close cases, to favor the construction which makes the sum payable for breach of

---

[9] There is no dispute in this case that the Agreement was negotiated at arms'-length
between sophisticated parties of equal bargaining power who freely contracted to the damages
provision in question.  *See* BWR's 56.1 ¶¶ 15-18; Manners Depo. at 73:19-74:7 (BFF had "lots"
of distribution agreements—"more than ten"—in place at the time it entered into the Agreement
with BWR).

a contract a penalty rather than liquidated damages[,] . . . [t]he balance has now shifted towards

freedom of contract, as it has become increasingly difficult to justify the peculiar historical

distinction between liquidated damages and penalties." *GFI Brokers, LLC v. Santana*, Nos. 06-

cv-3988 (GEL), 06-cv-4611(GEL), 2009 WL 2482130, at *2 (S.D.N.Y. Aug. 13, 2009) (cleaned

up).  Courts now "favor[] freedom of contract through the enforcement of stipulated damage

provisions so long as they do not clearly disregard the principle of compensation." *Id.* (quotation

marks omitted).

### b.  Application of Legal Standard

BFF has failed to sustain its burden of demonstrating that the liquidated damages

provision in the Agreement is unenforceable as a matter of law.  Accordingly, BFF is not entitled

to summary judgment on this basis.

### (i)  Reasonableness in Proportion to Probable Loss

BFF argues, in conclusory fashion, that it is "incongruous" that liquidated damages that

increased in amount over the life of the contract could be a reasonable measure of the parties'

anticipated harm.  BFF's Mem. at 15.  But BFF does not articulate anywhere in its motion papers

what that anticipated harm was,[10] and it provides no evidence or legal argument in support of its

contention that the amount of liquidated damages was unreasonable in proportion to the probable

loss.

BWR cites to the report and testimony of its expert, Robert J. Sipper, as proof that this

type of provision is "industry standard."  BWR's Mem. in Opp'n at 21.  "[G]eneral industry

---

[10] For its part, BWR does not explain in its papers how the termination fee of $5 per case for all cases sold over the entire life of the Agreement is linked to the damages BWR actually suffered as a result of BFF's termination of the Agreement, but BFF bears the burden of demonstrating the unreasonableness of the liquidated damages provision here.  *See Paguirigan*, 827 F. App'x at 119.

standards or customs may also be helpful in deciding whether a liquidated-damages clause is reasonable." *GFI Brokers, LLC*, 2009 WL 2482130, at *9 (quotation marks omitted). But the expert evidence on this question is, at best, inconclusive. In his report, Sipper wrote that a termination fee provision, which he refers to as a "buyout clause," is "industry standard" in distribution agreements between a manufacturer and distributor. Rainone Decl. Ex. 5 ("Sipper Report"). Yet Sipper also noted that both the amount and the length of time of the termination fee provision are subject to negotiation by the parties, and that there is no industry standard for the length of time of a termination fee provision. Sipper Report at 8-9; *see* Rainone Decl. Ex. 6 ("Sipper Depo.") at 62:7-63:12. Sipper added that he had seen termination fee provisions "ranging from as little as one year of prior sales to a formula based upon all sales during the life of the agreement," Sipper Report at 8-9, again calling into question whether the Termination clause of the Agreement here can be said to fit within any precise "standard." BFF also highlights the fact that various other BWR distribution agreements do not include a similar termination fee provision. *See* BFF's Mem. in Opp'n at 20-22; ECF No. 98 ("Rivkin Reply Decl.") Exs. D-I.[11] Regardless, industry standards are not dispositive of this issue. *See GFI Brokers, LLC*, 2009 WL 2482130, at *9 (industry standards are "certainly not dispositive"). The fundamental problem with BFF's motion on this point is that BFF has provided no evidence that the liquidated damages provision in the Agreement is unreasonable in proportion to the probable loss. *See, e.g.*, *Leeber Realty LLC v. Trustco Bank*, 316 F. Supp. 3d 594, 619 (S.D.N.Y. 2018)

---

[11] With respect to the amount of the termination fee provision, Sipper's report states that these provisions "typically are based upon one of two metrics": (1) "a dollar amount per case purchased by the distributor from the manufacturer over the life of the relationship, as in the case of the BWR/BFF Agreement"; or (2) "the difference between the distributor's listed everyday wholesale price and the price it pays the manufacturer for the product." Sipper Report at 8. BFF does not specifically challenge this aspect of Sipper's opinion.

(declining to find acceleration clause in lease an unenforceable penalty, noting that "Defendant makes *no* attempt to satisfy [its] burden.  It does not cite, let alone introduce, evidence relating to the disproportionality of the damages requested by Plaintiffs.") (emphasis in original), *aff'd*, 798 F. App'x 682 (2d Cir. 2019).

Finally, BFF challenges the liquidated damages provision as disproportionate on the ground that the size of one case of BFF's products was reduced in August 2017 from 24 bottles to 12 bottles, thereby increasing the number of cases sold and, in turn, the increasing the liquidated damages amount, which is calculated at $5 per case.  BFF's Mem. at 16-17.  But in assessing the enforceability of a liquidated damages provision, courts look at the facts as they existed at the time that the parties entered into their contract, which makes this change irrelevant to the Court's consideration of the reasonableness factor.  BWR's Mem. in Opp'n at 22; *see Paguirigan*, 827 F. App'x at 119.  And whatever conclusion BFF would have the Court draw from this change in case size—a change undertaken by BFF even with a full understanding of the existence of the liquidated damages provision, incidentally—it would not cure the deficiencies in BFF's presentation of evidence and permit summary judgment in its favor on this point.

### (ii)    Ability to Estimate Actual Loss

BFF likewise provides no evidence or legal argument in support of its contention that the amount of actual loss was not difficult to determine.  BFF simply states, without citation to any case law, that the Agreement is "a garden-variety distribution agreement" and that the "standard for damages for a breach of such an agreement is well-settled and frequently applied."  BFF's Mem. at 19.  But while BFF alludes to "the hundreds of cases involving distribution agreements where damages have been proven and awarded," *id.*, it fails to cite even one such case in its brief.  Moreover, this factor must also be considered in the context of the facts as they existed at

the time the parties entered into the Agreement.  BFF recites the "straightforward" structure of the Agreement as follows: "Belvoir sells products to BWR at a set price; BWR resells it to retailers at its set price.  That is it.  Each company has its expenses and carrying costs, which are fully documented on their books."  *Id.*  However, the results of the business relationship over time do not render BWR's damages ascertainable at the time that the Agreement was executed.

BWR relies on the Sipper Report for its contention that "actual damages clearly would have been difficult to determine at the time of the entry of the Distribution Agreement."  BWR's Mem. in Opp'n at 24.  Sipper stated in his report that "[t]ypically, new brands lose money for the distributor during the early years of the distribution agreement (as long as the first 4-5 years)."  Sipper Report at 8.  He also noted that the distributor is typically responsible for certain costs such as the sales team, warehousing, delivery costs, maintaining adequate inventory, sales forecasting, merchandising, and credit to certain customers, and stated that BWR was responsible for such costs as part of the BFF agreement.  *Id.* at 7-8.  BFF contests these assertions, pointing to deposition testimony where Sipper admitted, among other things, that he did not know whether BWR had in fact lost money distributing BFF's products for the first four or five years; that he had not reviewed BWR's financial records; that he had not analyzed how much BWR had spent on marketing BFF's products; that he did not know which, if any, of the categories of distributor costs BWR had incurred in any given year; and that he did not know what profit, if any, or gross revenues BWR had generated from selling BFF's products during any of the years that the Agreement was in effect.  BFF's Response ¶¶ 24-25 (citing Sipper Depo. at 58-60).  But even taking into account Sipper's deposition testimony, the key question for the Court in assessing the liquidated damages provision is whether the amount of BWR's potential loss was difficult to determine *at the time that the Agreement was executed*, not whether

BWR actually took any financial risks, incurred any costs, and/or suffered any damages over the life of the Agreement.  At bottom, BFF does not present sufficient evidence or legal authority to substantiate its argument that it would not have been difficult to determine BWR's costs or economic risks in becoming BFF's distributor in the United States at the time that the parties entered into the Agreement.

### (iii)    Other Arguments

BFF contends that "[t]he conclusion that the so-called 'termination fee' is a penalty is reinforced by the Agreement's description of it as precisely that," since the "Termination" section states that "Termination for Cause of the contract will be without penalty with 90 days['] notice."  *See* BFF's Mem. at 17.  BFF adds that "[a] logical reading of this language is that any termination without cause would in fact carry a penalty."  *Id.*  But "[i]n interpreting a provision fixing damages, it is not material whether the parties themselves have chosen to call the provision one for 'liquidated damages' . . . or have styled it as a penalty.  Such an approach would put too much faith in form and too little in substance."  *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425 (citations omitted).  Therefore, particularly in light of the other shortcomings addressed above, this language in the "Termination" section of the Agreement does not compel a finding that the liquidated damages provision is unenforceable.

BFF also challenges the liquidated damages provision on the ground that in providing for damages of "$5 per case for all cases sold since the beginning of the agreement or a full reimbursement of all Overhead, Regulatory, Marketing and Sales Promotions investments made since the beginning of the agreement (whichever is highest)," the Agreement impermissibly provides a choice between liquidated damages and actual damages.  BFF's Mem. at 20-21.  Yet BFF provides no evidentiary basis for its contention that "all Overhead, Regulatory, Marketing

and Sales Promotions investments" constitutes BWR's actual damages in the event of a breach—this argument represents nothing more than BFF's own view of what BWR deemed to be its actual damages. *See* BFF's Mem. in Opp'n at 26 ("BWR quite obviously deemed its unrecouped 'investment' to be its 'damages' in the event of a breach. Necessarily, BWR must have deemed itself capable quantifying this 'investment.'"). This contention also does not render the liquidated damages provision of the Agreement unenforceable.

* * * * * * * * * *

For all of the reasons set forth in Sections II.B.1 and II.B.2, BFF's motion for summary judgment as to BWR's breach of contract claim is DENIED.

### C.   BFF's Motion Regarding BWR's Other Claims

#### 1.   Breach of the Covenant of Good Faith and Fair Dealing

BWR's breach of contract claim obviates the need for any claim purportedly based on a breach of the implied covenant of good faith and fair dealing. "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quotation marks omitted). "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Id.* (cleaned up); *see Nuance Commc'ns, Inc. v. Int'l Bus. Machs. Corp.*, No. 16-cv-5173 (KMK), 2019 WL 2006180, at *15 (S.D.N.Y. May 7, 2019) (where breach of contract claim and breach of the implied covenant of good faith and fair dealing claim were "premised on the same facts" and "both claims [sought] the same remedy," the court found that "the implied-covenant claim [was] duplicative" and granted summary judgment as to that claim). BWR's claim for breach of the implied covenant of good faith and

18

fair dealing is essentially the same as its breach of contract claim—it is based on the same alleged misconduct and seeks the same relief.  *Compare* Compl. ¶¶ 44-46 (breaches included lack of basis to demand adequate assurances and cancellation of the Agreement) & 50 (seeking $2,462,835.00 in damages) *with* Compl. ¶¶ 54 (breaches included lack of basis to demand adequate assurances, wrongful repudiation of the Agreement, and cancellation of the Agreement) & 56 (seeking $2,462,835.00 in damages).  In its opposition papers, BWR points to various items of evidence that BWR believes constitute BFF's "mischievous dealings behind the scenes of the [Agreement]."  BWR's Mem. in Opp'n at 27.  But fundamentally, these additional assertions are made in support of the overarching claim that BFF wrongfully terminated the contract—which is the gravamen of the breach of contract claim.  Indeed, BWR also seeks summary judgment on this claim on the same grounds as it seeks summary judgment on its breach of contract claim (*see* Section II.C, *infra*)—that BFF did not have any basis to demand assurances of BWR's performance and that it ignored the assurances provided by BWR and terminated the Agreement. *See* BWR's Mem. in Opp'n at 38-39.

It is clear that BWR's cause of action for breach of the implied covenant of good faith and fair dealing is based upon the same facts as its breach of contract claim.  Accordingly, BFF's motion for summary judgment on this claim is GRANTED.

### 2.  Declaratory Judgment

BWR states in its opposition filing that it was "willing to voluntarily dismiss" its declaratory judgment claim, and had contacted counsel for BFF to execute a stipulation of dismissal which would be filed with the Court "before the return date of these motions."  BWR's Mem. in Opp'n at 30.  To date, no such stipulation has been filed.

BWR's declaratory judgment claim is unnecessary and inappropriate here since BWR "has an 'adequate, alternative remedy in another form of action,'" specifically, breach of contract. *Cable First Constr. Inc. v. Lepetiuk Eng'g Corp.*, No 20-cv-6679 (AKH), 2021 WL 2941843, at *4 (S.D.N.Y. July 12, 2021) (quoting *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 529 N.Y.S.2d 279, 281 (1988)).  The declaratory judgment claim is based on allegations that BFF terminated the Agreement without cause and "wrongfully repudiated" and "otherwise breached" the Agreement, *see* Compl. ¶¶ 59-60, which are the same allegations that form the basis for BWR's breach of contract claim.  Therefore, BFF's motion for summary judgment on the declaratory judgment claim is GRANTED.

### D.      BFF's Counterclaims

BFF moves for summary judgment only on its first counterclaim, for "action for the price" pursuant to N.Y. U.C.C. § 2-709.  BWR nominally opposes the motion and, in addition, cross-moves for summary judgment on BFF's remaining three counterclaims for tortious interference with contract, tortious interference with prospective economic advantage, and *prima facie* tort.

### 1.      N.Y. U.C.C. § 2-709

By its first counterclaim, BFF seeks to recover £320,340.70 for unpaid inventory that it supplied to BWR between September 2018 and April 2019.  The New York Uniform Commercial Code provides that "[w]hen the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price . . . of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer."  N.Y. U.C.C. § 2-709(1)(a).  Under the terms of

the Agreement, BWR was to pay BFF within 70 days of the date of any invoice issued.  Sonnois Decl. Ex. 1 at 3.

BWR does not oppose this claim on the merits.  *See* BWR's Mem. in Opp'n at 31 ("there is no dispute that certain goods were sold and delivered to BWR by BFF").  It states only that "summary judgment should be entered for BWR against BFF in an amount far in excess of any claimed monies due on invoices to BFF," and offers that if the case ends up going to trial, then "it is premature to enter judgment in *any* amount for BFF as any such amount would be wiped out by the amount sought by BWR at trial."  *Id.* (emphasis in original).

In sum, since BWR effectively concedes liability, BFF's motion for summary judgment as to its first counterclaim is GRANTED.  That said, the Court will defer entry of judgment on the counterclaim until final resolution of all of the remaining claims in the case.  *See S.E.C. v. Frohling*, 614 F. App'x 14, 17 (2d Cir. 2015) (summary order) ("[I]n the federal district courts, the entry of a final judgment is generally appropriate only after all claims have been adjudicated.") (quotation marks omitted).

### 2.  Tortious Interference with Contract / Tortious Interference with Prospective Economic Advantage / *Prima Facie* Tort

BFF also asserts counterclaims for tortious interference with contract, tortious interference with prospective economic advantage, and *prima facie* tort, all based on the same alleged misconduct.  BFF alleges that in order for BWR to be able to sell BFF's beverages to Whole Foods, BWR entered into a relationship with IX-ONE, a company that provides retailers with product information and images.  ECF No. 5 ("Counterclaims") ¶ 11.  According to BFF, IX-ONE eventually came to serve as a link between BWR and BFF's largest retailers.  *Id.*  BFF alleges that when it decided to treat its Agreement with BWR as repudiated, it decided to switch its product information vendor from IX-ONE to World Finer Foods ("WFF"), and to transfer its

distribution business from BWR to WFF.  BFF entered into a binding contract with WFF on or about July 22, 2019.  *Id.* ¶¶ 28, 49.  Upon learning of this decision, BWR instructed IX-ONE not to send any of BFF's product information or images to WFF.  *Id.* ¶ 28.  As a result, BFF alleges that it has been unable to supply its products to its largest retailers.  *Id.*  BFF further alleges that BWR knows that Whole Foods and other retailers want to continue purchasing BFF's products, and that BWR's actions in refusing to allow the transmission of data to WFF is preventing Whole Foods and the other retailers from doing so.  *Id.* ¶ 52.

BWR maintains that it is entitled to summary judgment on these three counterclaims because BFF has failed to produce any facts in discovery to support such counterclaims and because BFF "admitted that it had suffered no damages whatsoever [from] anything to do with IX-ONE . . . ."  BWR's Mem. in Opp'n at 31-33.  BWR also argues that the *prima facie* tort counterclaim is barred by the economic loss doctrine.  *Id.* at 32.

A claim for tortious interference with contract requires "'[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom.'"  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).

"To prevail on a claim for . . . tortious interference with prospective economic advantage . . . under New York law, a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts

injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quotation marks omitted).

"Under New York law, there are four elements to a claim of *prima facie* tort:  (1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful."  *McKenzie v. Dow Jones & Co., Inc.*, 355 F. App'x 533, 536 (2d Cir. 2009) (summary order) (quotation marks omitted).

In response to BWR's cross-motion seeking summary judgment as to BFF's two tortious interference counterclaims and its *prima facie* tort counterclaim, BFF has not come forward with any record evidence to substantiate those counterclaims, nor has it offered any legal argument in opposition to BWR's contentions.  In its 56.1 Statement, BWR cited the deposition testimony of Peverel Manners in support of its statement that "BFF is only seeking damages related to the approximate 320,000 pounds of delivered, but allegedly unpaid, product."  BWR's 56.1 ¶ 110 (citing Manners Depo. at 77:14-21 ("Q. . . . [Y]our counterclaim is approximately 320,000 pounds for product delivered to BWR?  A.  Correct. . . . Q.  Is there any other damages [BFF] is seeking in this case?  A.  No.  Just payment for what we delivered.").  In response, BFF "[a]dmitted that [BFF] is seeking damages for the 17 unpaid invoices, in the total amount of 320,340.74 British pounds," citing the statement of BWR's account attached to the Hemmings Declaration.  *See* BFF's Response ¶ 110; ECF No. 88 ("Hemmings Decl.") Ex. B.  BFF did not state that it was seeking any other damages, or cite to any other evidence in support of its damages.  Similarly, although BFF denied BWR's statement that it "has suffered no damages as a result of anything dealing with [IX-ONE]," BFF's Response ¶ 112, BFF cited no evidence to support the denial.

Summary judgment is warranted here based on BFF's failure to present any evidence in support of its counterclaims for tortious interference with contract, tortious interference with prospective economic advantage, and *prima facie* tort.  *See*, *e.g.*, *Hattar v. Carelli*, No. 09-cv-4642 (VB), 2012 WL 246668, at *5 (S.D.N.Y. Jan. 11, 2012) (granting summary judgment on claim for negligent hiring and retention where plaintiffs "have failed to adduce any evidence" and on claim for negligent training where there was "no evidence to support this claim"); *Alfonso v. City of New York,* No. 03-cv-3526 (SHS), 2004 WL 1396136, at *2-3 (S.D.N.Y. June 21, 2004) ("Although plaintiff enjoys the benefit of all reasonable inferences in order to survive a motion for summary judgment, he is not permitted to rest upon the allegations in his complaint, and . . . must set forth specific facts showing that there is a genuine issue for trial.") (quotation marks omitted).

Accordingly, BWR's motion for summary judgment as to BFF's counterclaims for tortious interference with contract, tortious interference with prospective economic advantage, and *prima facie* tort is GRANTED.

### E.    BWR's Cross-Motion Regarding Its Breach of Contract Claim

BWR maintains that it is entitled to summary judgment on its claim for breach of contract because BFF allegedly terminated the Agreement without cause.  More specifically, BWR contends that (i) BFF had no grounds to demand adequate assurances of BWR's performance; (ii) BWR provided adequate assurances; and (iii) BFF nonetheless terminated the Agreement without cause.  BWR's Mem. in Opp'n at 34-38.

### 1.    The Letter Exchange

The March 26, 2019 letter sent by Paul Parkins, BFF's Chief Operating Officer, to Olivier Sonnois of BWR, seeking "formal adequate assurances of future performance," Sonnois

Decl. Ex. 4, cited several concerns.  First, BFF stated that BWR "has persistently breached its payment obligations by failing to make payments on time without any legitimate excuse."  *Id.* at 1.  Second, BFF asserted that BWR "misstated to us its sales volume and failed to achieve the mutually agreed sales volume targets for 2018."  *Id.*  Parkins claimed that this was "in part due to BWR not adequately investing to support the brand, including and not limited to, providing sufficient commercial resourcing."  *Id.*  Third, BFF explained that Coface, BFF's global credit insurer, had "withdrawn previous levels of commercial insurance offered for sales to BWR," and that this decision "apparently reflects Coface's concern that BWR is not as financially stable as it was previously and may not be able to meet [its] former levels of payment obligations to [BFF] when they fall due."  *Id.*  Parkins also noted that BWR had "continued to remove personnel from key positions, including sales and marketing"; that BWR had "summarily dismissed Coface's concerns without providing any countervailing information"; and that BWR "cancelled a planned meeting . . . in New York at which our concerns were to be discussed at very short notice."  *Id.* at 2.  Parkins stated that BWR's assurances "must address the matters described above—including the ability to make timely payment, the ability to obtain prior levels of insurance coverage, and the ability to provide adequate marketing and sales support—as well as all other aspects of the performance BWR owes [BFF]."  *Id.*

Sonnois responded to Parkins by letter dated April 10, 2019, and sought to address BFF's concerns.  *See* Sonnois Decl. Ex. 5.  Sonnois noted that "[s]ince launching [BFF] products in the US market eight years ago, BWR has invested substantial resources, including monetary investments and manpower commitments, to create a significant base of [BFF] beverage sales."  *Id.* at 1.  According to BWR, it had "grown the sales far beyond the initial expectations of all parties[,] as consistently acknowledged during numerous meetings and reviews conducted on a

regular basis throughout the term of the Distribution Agreement with the management teams of the parties then in place." *Id.*  Sonnois further asserted that "[s]ince the very first days of BWR['s] relationship with BFF, all invoices have been paid in full to BFF and in a timely manner." *Id.*  While acknowledging that in early 2019, BFF said it was receiving payments "a few days behind the effective due dates," BWR claimed that "measures have been taken to ensure that all recent invoices are paid within the 70 day contractual term in order to ensure a receipt of payment by BFF in a timely manner." *Id.*  Sonnois explained that BWR "experience[d] a slower rate of growth over the last 18 months . . . caused in large measure by a transition to a new 12-pack product configuration from BFF and some significant restructuring within large US retailers currently distributing the brand . . .," and not because of "BWR's failure to perform its obligations under the Distribution Agreement." *Id.*  Sonnois accused Parkins of a campaign of "consistent efforts to disrupt BWR's current flow of business for BFF products in North America," noting that "BFF withheld Purchase Orders placed by BWR by over three weeks in February and March 2019 and imposed a drastic price increase of 6%, far in excess of any published inflation ratios in the UK or the US." *Id.* at 2.  He added that "such cost changes will almost certainly affect BWR's ability to maintain increased sales volumes." *Id.*  Sonnois also stated that "BWR's Purchase Orders were being held by BFF without any late or overdue amounts due to BFF under the Distribution Agreement." *Id.*

With respect to Coface, Sonnois wrote that "as you have been advised, BWR has made an effort to establish direct communication with the representatives of Coface in the United States," and "[i]n those communications, it was confirmed that BFF should have no issue obtaining appropriate coverage despite BFF's disingenuous representations to the contrary." *Id.*  He emphasized that "BWR is under no obligation to provide support to BFF for its insurance

coverage issues." *Id.* Sonnois then claimed that "BFF has been in breach of its obligations under [the] Distribution Agreement by refusing to ship BWR Purchase Orders for valid reasons." *Id.* at 3. He reiterated that the "drastic" cost increase of 6% as of April 2019 "will almost certainly affect BWR's ability to grow volumes as noted in the Distribution Agreement." *Id.* He added that BFF's "unfounded allegations regarding BWR's financial stability" were "totally without merit," and that BWR had made "substantial investments," including in sales staffing over the last two years, "while being selected as an exclusive distribution partner by other major multi-national companies such as Nestle and Illy." *Id.* Sonnois cited BFF's own changes in staff working with BWR teams over the last 24 months, which "caus[ed] much disruption to the ongoing relationship." *Id.*

Finally, Sonnois noted that "[a]s communicated on multiple occasions by email, [Parkins] had received a full 10-day notice of the need to reschedule our March 19th meeting until a time when all BWR long overdue Purchase Orders have been shipped," but Parkins ignored these email communications. *Id.* Sonnois declared that "BWR and its team will continue to abide by all the terms of our Distribution Agreement and continue to provide full support for distributing the BFF products in North America despite the material obstructions implemented by BFF, which have caused recent disruption and adversely affected performance." *Id.*

### 2. The U.C.C. Framework

Section 2-609 of the New York Uniform Commercial Code—"Right to Adequate Assurance of Performance"—states that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he [or she] receives such assurance may if commercially reasonable suspend any performance for which he [or she] has not already received the agreed return." N.Y.

U.C.C. § 2-609(1).  The statute further provides that "[b]etween merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards."  N.Y. U.C.C. § 2-609(2).  "After receipt of a justified demand[,] failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."  N.Y. U.C.C. § 2-609(4).

The Second Circuit has noted that while "[i]t is generally a question of fact whether a buyer has reasonable grounds for insecurity under § 2-609 . . . [t]here are circumstances . . . where this issue may be resolved as a matter of law."  *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 702 (2d Cir. 1993) (citation omitted).  Nonetheless, "the relative rarity of these cases reflects that whether reasonable grounds for insecurity exist and whether proffered assurances are adequate are case specific."  *Remuda Jet Five LLC v. EMBRAER-Empressa Brasileira de Aeronautica, S.A.*, No. 10-cv-8369 (NRB), 2012 WL 1142296, at *9 (S.D.N.Y. Mar. 27, 2012); *see Enron Power Marketing, Inc. v. Nevada Power Co.*, No. 01-cv-16034 (AJG), 03-cv-9318 (BSJ), 03-cv-9332 (BSJ), 2004 WL 2290486, at *3, *6 (S.D.N.Y. Oct. 12, 2004) ("[w]hether a buyer has a reasonable ground for insecurity is a question of fact," and "[w]hether or not the assurances offered were adequate, as per commercial standards and under the circumstances, is a question of fact.").  In assessing the parties' conduct, "it is the objective basis on which the contracting parties in good faith demand or provide assurance that is relevant."  *Remuda Jet Five LLC*, 2012 WL 1142296, at *12.

### 3.    Reasonable Grounds for Demanding Assurances

"The first requirement of the assurances process is that a party's grounds for demanding

assurances be reasonable." *Enron Power Marketing, Inc.*, 2004 WL 2290486, at \*3.  The parties

dispute whether there were reasonable grounds for BFF to demand adequate assurances.

BWR takes issue with the portion of the demand based on Coface's decision to stop

providing credit insurance coverage to BFF on its sales to BWR, because credit insurance was

not required by the Agreement.  BWR's Mem. in Opp'n at 35-36.  "Under commercial standards

and in accord with commercial practice, a ground for insecurity need not arise from or be

directly related to the contract in question."  N.Y. U.C.C. § 2-609(2), Official Comment (3).

"However, a ground for insecurity, arising from whatever source, must produce insecurity about

whether contractually owed performance will occur." *Remuda Jet Five LLC*, 2012 WL 1142296,

at \*10 n. 9.  As reflected in the email exchange between BWR and BFF in February and March

2019, the parties disputed the significance of the Coface decision and its implications with

respect to the state of BWR's finances.  *See* Rainone Decl. Ex. 10.[12]  Among other things, a

February 27, 2019 email from Coface to BFF, noting that Coface "had to cancel cover for all

other clients on [BWR] too due to the overdues," *see* Rivkin Reply Decl. Ex. N, may be viewed

as giving rise to a reasonable concern that BWR was having difficulty making payments on all of

its accounts.  While there is no dispute that credit insurance was not required by the Agreement,

---

[12] In a February 26, 2019 email, Olivier Sonnois of BWR stated: "I understand your insurance internal challenges and unsure if they are related to the Brexit process as no other company we are dealing with is experiencing the internal issues you seem to be having, and we have far greater ongoing receivable amounts with them."  Rainone Decl. Ex. 10.  In a responsive March 1, 2019 email, Paul Parkins of BFF stated: "I see no value in responding to suggestions that BWR's insurance downgrade and subsequent pulling of credit has anything to do with [BFF's] own liquidity or Brexit . . . .  Despite our best efforts, we have found NO insurer willing to provide cover for credit risk with BWR . . . .  We have been notified . . . that Coface's underwriters (not Coface!) have withdrawn cover for all suppliers to BWR."  *Id.*

there are disputed issues of material fact as to whether Coface's cancellation of credit insurance—later reinstated on less favorable terms, *see* BFF's Response ¶¶ 78-79, 87—gave rise to a reasonable concern regarding BWR's financial ability to perform its contractual obligations.[13]

Regarding BWR's alleged failure to make payments on time, BWR cites evidence that it consistently failed to make payments on time throughout the years that the Agreement was in effect, without any complaint from BFF.  *See* BWR's Mem. in Opp'n at 36; BWR's 56.1 ¶¶ 47-48.  Moreover, BWR also cites to an email exchange in which BWR's Sonnois emailed BFF's Parkins on February 26, 2019 stating, "[o]n the pending orders, it is my understanding that we have no outstanding payment dues," and Parkins did not respond to the contrary.  *See* Rainone Decl. Ex. 10; ECF No. 101 ("BWR's Reply Mem.") at 5.  At the same time, it is noteworthy that in the April 10, 2019 response to the demand for adequate assurances, BWR asserted that "[s]ince the very first days of BWR['s] relationship with BFF, all invoices have been paid in full to BFF and in a timely manner."  Sonnois Decl. Ex. 5 at 1.  In other words, while BWR has taken the position in this litigation that untimely payments were a feature of the BWR/BFF relationship, BWR was disputing that allegation at the time the parties' relationship was

---

[13] As BWR points out in its reply brief, Sonnois sent Manners and Parkins an email on March 4, 2019, informing them that BWR had just entered into a new partnership with global brand Illy, *see* ECF No. 101 ("Rainone Reply Decl.") Ex. 2, undercutting BFF's claim that it had reason for concern about BWR's ongoing viability during that period.  In his reply declaration, Hemmings states that BFF learned in mid-March 2019 that BWR "had severely cut its staff, having laid off eighteen people" and "had lost Go-Go Squeeze, its 4th largest brand," but he cites no evidentiary source for this statement.  *See* Hemmings Reply Decl. ¶ 20.

Moreover, although BFF cites later-obtained evidence to support its contention that BWR was in financial dire straits at the time that BFF sought adequate assurances, *see, e.g.*, BFF's Mem. in Opp'n at 32-33; BFF's Response ¶ 75, it is not clear how this is relevant to the Court's analysis since it was not known by BFF at the time the assurances were sought.

deteriorating.  The now admitted continued failure by BWR to make timely payments, when viewed in the context of Coface's decision to cancel credit insurance on all shipments to BWR, could be viewed by a jury as a reasonable basis for seeking assurances.  It could also be viewed as a routine matter that BFF was suddenly using as a pretext even though it had never raised such concerns before.

Finally, although BFF referenced BWR's failure to achieve agreed-upon sales volume targets for 2018 as a ground for seeking assurances, BWR accurately notes that the Agreement does not include any requirements regarding sales volumes, but rather only minimum volumes of product that BWR was obligated to purchase from BFF, which targets BWR exceeded.  *See* BWR's Mem. in Opp'n at 36; BWR's 56.1 ¶¶ 33, 53-54.  BFF has not responded to this argument from BWR.  Nonetheless, based on the conflicting evidence discussed above, there are multiple material factual disputes regarding the reasonableness of BFF's grounds for demanding assurances; accordingly, the question of whether such demands were appropriate cannot be resolved as a matter of law.[14]

### 4.    Adequacy of the Assurances

"There is no absolute definition of adequate assurances; rather, the adequacy depends on the circumstances." *Enron Power Marketing, Inc.*, 2004 WL 2290486, at *5.  "In appropriate circumstances, a promise to perform can be an adequate assurance." *Id.*, at *6.  "In addition, assurances may be less than demanded and still be adequate." *Id.*

---

[14] The parties cite additional factual disputes regarding the need for adequate assurances—such as BFF's proposal of a revised contract in mid-March 2019, which was rejected by BWR, and BWR's inability to have an in-person meeting with BFF during that same period. *See* BFF's Mem. in Opp'n at 32; BWR's Reply Mem. at 6-8.  The Court need not address each and every one of these disputes, as they simply provide further support for the conclusion that this issue cannot be decided on summary judgment.

The parties also dispute the adequacy of the assurances provided by BWR.  BWR maintains that it provided adequate assurances by (i) noting that it had taken measures in early 2019 to ensure that payments were made within the required 70-day period, and (ii) explaining that the slowdown in the growth of sales in 2018 was caused by BFF's transition to a new 12-pack product configuration, significant restructuring within large US retailers, BFF's withholding of orders placed by BWR in February and March 2019, and BFF's decision to raise prices by 6 percent.  *See* BWR's Mem. in Opp'n at 37-38.  BWR contends that it did not need to provide adequate assurances regarding credit insurance since credit insurance was not a requirement of the parties' contract.  *See* BWR's Reply Mem. at 9.

For its part, BFF argues that BWR did not provide assurances at all.  *See* BFF's Mem. in Opp'n at 33-34.  It notes that BWR's representation that "[s]ince the very first days of BWR relationship with BFF, all invoices have been paid in full to BFF and in a timely manner" was "patently false" and that "BWR's payment delay had been chronic and had gotten far worse and problematic since the end of 2018."  *Id.*  BFF also points out that with respect to Coface's cancellation of credit insurance, BWR's statement that it had "confirmed that BFF should have no issue obtaining appropriate coverage" was also false given the efforts BFF had to make to get Coface to reinstate coverage.[15]  *Id.* at 34.

Ultimately, the question of whether the assurances provided by BWR were adequate is subject to the same range of factual disputes as the question of whether BFF's demand for

---

[15] There is evidence in the record that Coface USA had a different view from Coface UK with respect to the provision of credit insurance for BWR.  On March 13, 2019, Sonnois shared with Manners and Parkins an email exchange that he had with Douglas Flynn of Coface USA, in which Sonnois asked Flynn why BFF was "unable to receive any updated insurance coverage from the Coface UK office despite multiple requests.  (Other than a 50K coverage)."  Flynn replied, "I do not know who they are speaking with, but I am confident that this information is incorrect."  ECF No. 101 ("Rainone Reply Decl.") Ex. 3.

assurances was reasonable in the first place.  Given the facts and circumstances of this case, and given the record presented by the parties on these cross-motions for summary judgment, the Court cannot determine as a matter of law whether BWR provided adequate assurances in response to BFF's demands.

*       *       *       *       *

In sum, because there are questions of fact as to whether there were reasonable grounds for BFF to demand adequate assurances and whether BWR provided adequate assurances in response to the demand, BWR's cross-motion for summary judgment on its breach of contract claim is DENIED.

**CONCLUSION**

For the foregoing reasons, BFF's motion for summary judgment (ECF No. 84) is GRANTED IN PART AND DENIED IN PART, and BWR's cross-motion for summary judgment (ECF No. 92) is GRANTED IN PART AND DENIED IN PART.  BWR's claims for breach of the implied covenant of good faith and fair dealing and declaratory judgment are dismissed, and BFF's counterclaims for tortious interference with contract, tortious interference with prospective economic advantage, or *prima facie* tort are likewise dismissed.  Summary judgment is granted as to BFF's counterclaim under N.Y. U.C.C. § 2-709, but the Court will defer entry of judgment on the counterclaim until final resolution of all the remaining claims in the case.

An in-person status conference is hereby scheduled for October 19, 2022 at 2:00 p.m. in Courtroom 250 in the White Plains federal courthouse.  In advance of the conference, counsel must meet and confer to discuss appropriate next steps in this case, including potential trial dates between January and June 2023.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 84, 101, 102, and 108.

Dated: September 29, 2022
      White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge